Davis, Judge,
delivered the opinion of the court:
This is a contract case, brought by the plaintiff, receiver for Dorchester Equipment Co., Inc. (the company is sometimes called plaintiff), for breach of a construction contract between that firm and the United States, acting through the Post Office Department. The contract was in lump-sum form, subject to adjustment for unit prices for piling, pre-drilling for piling, and other such items. The price arrived at by competitive bidding was $265,000. The award was made on July 19, 1961, by the Post Office Department, Bureau of Facilities, Division of Beal Estate. The work required the contractor to furnish all labor, equipment and materials and perform work for demolition, removal of railroad trackage, canopies, etc., necessary to construct footings for a future canopy at Terminal Annex, South Postal Annex, United States Post Office, Boston, Massachusetts. The plans and specifications had been prepared by Pedersen and Tilney, architects of Boston. The work was to commence as soon as possible after receipt of notice to proceed and was to be completed in 150 calendar days after receipt of that notice. The completion date thus computed became December 27, 1961.
The plaintiff makes claim on account of extra work necessitated by changed conditions, for costs incurred by reason of unreasonable delays to the work, and for damages resulting from the alleged wrongful termination of the contract.
The intervenor, the Aetna Casualty and Surety Company, became the surety on the performance and payment bonds. By motion to intervene on the ground that representation of its interest is or may be inadequate, that it may be bound by the judgment, and that it has a pecuniary interest in the subject matter of the action, the intervenor has been permitted to be *728 added, as a party to this litigation and has participated in the proceedings. By arrangement with the Government, the surety completed the contract work.
The defendant filed a counterclaim against the plaintiff covering certain architect-engineer expenses and other expenses by reason of alleged defective work, in the sum of $5,789. The defendant also filed a contingent counterclaim against the intervenor for sums which the court might find were paid by the defendant to Aetna, but which should have been paid to the Dorchester Equipment Company. It originally asked judgment, also, over against Aetna for any amount awarded to the plaintiff, but that claim is no longer pursued.
The contractor’s claims were the subject of an appeal to the Post Office Board of Contract Appeals which, after extended hearings, found that the “termination for default was premature”, and remanded the matter to the contracting officer for settlement of the amount due Dorchester. When the parties were unable to agree on a settlement, additional hearings were held and a subsequent decision was entered which allowed the plaintiff $20,725.47 for extra work but held that the Board was without jurisdiction to determine liability for delay claims or standby time or the claim relating to termination for default. There is no evidence that the $20,725.47 was ever paid to the plaintiff or Dorchester Equipment. In this court, the parties agreed to a trial de novo which has been held.
As a result of the trial, the trial judge determined: “On the basis of the entire record it is concluded that the termination for default was improper and unwarranted and a breach of the contract since a great deal of the delay which was charged to the plaintiff was actually the fault of the defendant through its architect and in turn through its architect’s subcontractor. Additional causes of delay are clearly not chargeable to the contractor since they were due to the encountering of a great many underground obstructions which interfered with the orderly progress of the work by not only the contractor but its pile-driving subcontractor. For such breach of contract the defendant must respond in *729 damages for 'the breach.”[1] Defendant does not challenge these conclusions, nor does it contest that the contractor performed additional work for which it should be compensated. It is therefore unnecessary to recite the facts showing that the trial judge is correct. (His findings on these points, which we adopt, present sufficient detail.) The issues which remain to be decided concern the amounts of recovery 'by the plaintiff (Part I, infra) and by the surety (Part IT, infra), and the disposition of the Government’s counterclaims (Part III, infra).
I
The trial judge found $63,602.30 now owing by defendant to plaintiff. The Government contests only one item (i.e. anticipated profits), but plaintiff asks us to add several additional sums. We reject all of these exceptions and confirm the amount arrived at by the trial judge.
a. Since this was an old-style contract which did not provide that a wrongful default termination was to be considered a convenience-termination, plaintiff was entitled to anticipated profits for work not yet performed at the time it received the improper notice of default termination. See General Builders Supply Co. v. United States, 187 Ct. Cl. 477, 485-86, 409 F. 2d 246, 251 (1969); J. D. Hedin Constr. Co. v. United States, 187 Ct. Cl. 45, 58-59, 408 F. 2d 424, 431-32 (1969). The trial judge assessed this at $28,042.70, a sum derived from the costs incurred and the profit made by the company which completed the work on behalf of the surety. The Government argues that it was error to use that firm’s profit-and-costs as a measure, and that the correct gauge of anticipated profits would take into account the relationship of the amount of work left undone by Dorchester Equipment to the contract’s original fixed price. The latter amount was $265,000, and under our findings Dorchester performed $152,000 of this work, leaving $113,000 worth still to be performed; defendant would grant plaintiff 10% of this sum ($11,300) in anticipated profits.
*730 We hold that the trier’s method was acceptable. If Dor-chester had not been wrongly terminated, it would have completed the contract and probably done the same work and incurred the same costs (including a very considerable amount of extras) as the company which actually finished the job. The completing firm’s profit is therefore a reasonable basis for the award to plaintiff of the gain it lost through the Government’s wrongful ending of the contract. As we point out below (Part II, B, infra), the completing firm’s actual costs and outlays must be taken on this record as reasonable — and it is not far-fetched to infer that Dorchester would have had equivalent expenses and done about the same amount of work.
b. 1. In his brief, plaintiff specifies a number of work items, omitted by the trial judge, for which he says Dor-chester should be further compensated.[2] We agree with defendant that, as to one instance, the trial judge did in fact cover the item and allow compensation, and, as to the others, plaintiff has made insufficient proof that it incurred the costs now claimed. On these items, there is plainly insufficient reason to overturn the trial judge’s considered denial of compensation. Cf. Davis v. United States, 164 Ct. Cl. 612, 616-17 (1964).
2. A more important controversy concerns an unpaid judgment plaintiff says was obtained against Dorchester by Eaymond International, Inc., the subcontractor for the foundation and pile-driving work.
It is agreed by everyone that the surety and Dorchester were made defendants in a Miller Act suit brought by Eay-mond in the United States District Court for the District of Massachusetts, covering the pile-driving work that firm had performed for the plaintiff, extra work required in the performance, as well as delay it encountered. A settlement was effected under which judgment was entered against the surety for $60,500, which has been paid, and judgment over *731 was also entered in favor of the surety against Dorchester and its officers individually for the same amount (which has not been paid). The trial judge included this $60,500 in the surety’s damages recoverable from defendant (see Part II, D, infra).
Plaintiff claims that there was another judgment (for $61,546.78), in another litigation, obtained by Raymond against Dorchester, which is still outstanding and unpaid. This second judgment, we are informed, was entered on Raymond’s affidavit that it had expended this additional amount and on Dorchester’s failure to respond.[3] The trial judge, plaintiff insists, simply overlooked this extra judgment a,nd therefore deprived plaintiff of a large sum in damages.
Defendant urges strenuously that plaintiff never made proper proof of this alleged judgment, and that it was for that reason that the trier took no account of it. The only relevant document accepted in evidence, before proof was closed, was a copy of an execution form referring to this judgment; no copy, let alone a certified copy, of the judgment itself was introduced. Defendant specifically objected, before the trial judge, that there was no record evidence of this second judgment.
In its exceptions to the trial judge’s opinion and findings, plaintiff reproduces a copy of a “judgment on counterclaim” entered by the District Court for $61,546.78, as well as Raymond’s affidavit (in support of its motion for summary judgment) on which that judgment was based. Defendant has moved to strike those documents as not properly put in evidence — at the appropriate time — and therefore not to be considered by the court.
It is plain to us that plaintiff did not make adequate proof, at the correct time, of this judgment of Raymond against Dorchester, and that it is impermissible for plaintiff now to bolster its defective case by presenting exhibits to us which it failed to offer properly before the trial judge. The case should have been tried according to the established pro *732 cedures, and there is no excuse for the belated post-trial effort to shore up an evident gap in plaintiff’s evidence.[4] The trial judge undoubtedly considered that there had been a total failure of proof on this point, and we agree.[5]
There is, moreover, another defect in plaintiff’s reliance on this judgment. Since the United States is not bound by the litigation and the judgment to which it was not a party, plaintiff could recover this amount from the Government only if there were good reason to believe that this proceeding with Raymond was bona -fide and the alleged judgment actually represented costs for which plaintiff was properly liable to Raymond. Cf. Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 368-69, 347 F. 2d 509, 535-36 (1965), rev'd on other grounds, 385 U.S. 138 (1966). There are serious doubts on both scores. One difficulty is that, although the judgment in the earlier suit involving Raymond, the surety and Dorchester (resulting in the settlement for Raymond for $60,500) could probably have been argued to estop Raymond collaterally from claiming an additional recovery, or to release Dorchester from paying Raymond any further sums, those defenses were apparently not presented. And, moreover, judgment was allowed to be entered, in effect by default, simply on Raymond’s affidavit of additional costs (above the $60,500 granted in the other judgment), which affidavit is conclusory, not specific, and far from persuasive.[6] As we point out immediately below, the proof in the present *733 litigation does not support this extra $61,546.78 as representing work actually performed by Raymond.
3. Aside from the demand that he be reimbursed for this $61,546.78 judgment, plaintiff maintains that, in any event, Dorchester’s recovery with respect to the work done by Raymond should be calculated, not according to the value of the work the latter did, but rather on the basis of the prices Dor-chester “charged” defendant in the prime fixed-price contract. The findings are that Raymond actually performed $52,000 worth of work ('according to its invoices), and that defendant has paid Dorchester $22,130 for this work. Some of the unchallenged items for additional work (which we are awarding) may also represent work done by Raymond. Plaintiff now demands a very large further sum (almost $84,000), but the short answers ¡are that (i) this inflated figure includes the unproved “extras” which Raymond stated so summarily in its affidavit in the District Court but which were not proved in the current proceeding, and as to which there is no proper showing of liability by plaintiff to Raymond, and (ii) if Dorchester was entitled to a reasonable profit and overhead on the work done by the subcontractor (over and above the amount already paid out to plaintiff or to be paid under our judgment) plaintiff has utterly failed to prove it. In sum, the present record does not sustain any damages for work done by Raymond greater than those we •are allowing.
4. At the oral argument plaintiff changed his position to claim that nothing at all should be paid to the surety but that the whole award — which plaintiff computes at $453,525.36, including a completion cost for the surety of $140,805.30— should go to him, his obligation (he says) then being to pay the -two judgments discussed above, as well as the surety.[7] This drastic change of position comes much too late and cannot be considered. The case was tried and presented to the trial judge on a wholly different basis; the briefs and exceptions to his decision and findings were also grounded on that *734 other basis; in particular, plaintiff did not at all object to the making of an award directly to the surety.[8] There is no good excuse for the sudden and extreme modification in the scope of plaintiff’s claims. It would be unfair to the other parties and destructive of the requirements of orderly procedure to allow plaintiff, at this late stage, the unearned indulgence he seeks. In any event, we reject on its merits plaintiff’s new contention that the surety is not entitled to any judgment. See Part II, A, infra.
The result is that the trial judge’s award to plaintiff, in the sum of $63,602.30, is sustained against the attacks by both the Government and the plaintiff.
II
Aetna, the surety, is content with the trial judge’s award to it, but the defendant assails the award in toto, and also with respect to specific items.
a. The surety asks, from the defendant, its costs of completion over and above the contract balance (plus authorized changes). It is this aspect of the award which the Government particularly challenges. Unlike Dale Construction Co. v. United States, 168 Ct. Cl. 692, 733, 847-49 (1964), and William Green Construction Co. v. United States, 201 Ct. Cl. 616, 629 n. 10, 477 F. 2d 930, 938 n. 10 (1973), there is no allegation or adequate showing in this case that the contractor is liable to the surety for the excess costs of completion (over and above the amount of the contract) .[9] The Government’s main barrage is, therefore, that the contractor is wholly uninterested and uninvolved in the recovery of these additional sums, and the surety cannot sue here because it *735 has no contract, express or implied, with the United States for the recovery of these amounts.[10]
Whatever may be the rule if the surety had not finished the work by agreement with the United States, that is not the situation here. After the wrongful default termination, the contracting officer called upon Aetna to complete the remainder of the work. Pursuant to a written agreement between the surety and the contracting officer, based upon that officer’s decision that the plaintiff was in default, the balance of the work, including extras, was fully performed by the surety company, through another contractor, by about November 1,1962. In the performance of the work, the surety expended $280,427.06 and received from the defendant $212,163.80, leaving a difference of $68,263.26.
In the written agreement between the surety and the defendant, Aetna undertook to complete the work (through the Tredennick-Billings Company), and the Government agreed to pay the surety the entire contract balance plus extras (if any) ,[11] The Government now urges that its obligation was strictly limited to the technical contract balance— not including the excess costs, even if the default turned out to be wrongful — but we think the agreement should not be interpreted so rigidly and literally. Fairness requires a more expansive and equitable reading.
If Aetna had refused defendant’s request to complete, and the Post Office Department had had to contract with some other construction firm to finish the work, that company would probably have had to incur the same excess costs as Aetna (and its completing subcontractor Tredennick-Billings) , but, though the United States would have to pay those excess costs to the completing firm, it would not be able to recoup the amount either from Dorchester or from Aetna— the termination of Dorchester’s contract being wrongful, neither the contractor nor the surety would be liable for the *736 excess costs of reprocurement. The defendant, in short, would have to bear the additional costs itself.
Similarly, if Dorchester, like the contractor in Dale Construction Co., supra, had made an indemnity agreement with Aetna, then Dorchester (or the plaintiff-receiver in its stead) could have recovered from the United States the amount of the surety’s excess completion costs (whether or not the surety had a formal take-over agreement with the Government). That is the holding of the Dale Construction opinion, and defendant explicitly disavows any challenge to the rule. In that situation, too, the United States would have to pay the bulk of the excess expenses.
There is no good reason why the United States should be in a better position because, without indemnity from the contractor, the surety undertakes, at Government urging, to finish the work under a written take-over agreement. The Government gets the same benefit, and incurs no greater risk or burden, as when it chooses an outside firm to complete, or when the surety completes but with an indemnity obligation from the contractor. Nevertheless, defendant insists that, in this instance, the whole risk must be the surety’s; it should not, the Government says, agree to complete unless it is willing to accept the correctness of the default termination as a postulate. But that is not the rule or the requirement if the contractor (as in the Dale Construction Company case) makes itself liable to the surety. If the defendant’s proposed rule were put into effect, sureties without indemnity agreements would be deterred from undertaking completion jobs since they could be far worse off (if the default termination turned out to be improper, and if excess costs were incurred) than if they allowed the Government to find its own completion contractor. The normal policy is to let sureties finish the job, a policy which ordinarily runs to the mutual advantage of Government and surety and tends to reduce the expenses of completion. The generally-phrased completion agreement in this case should be understood in that light, instead of thrusting the entire risk on the surety and discouraging it from taking over. If the Government wishes the surety *737 to shoulder the entire risk (unless it can obtain an indemnity agreement from the defaulted contractor), the agencies should say so much more specifically in their completion agreements. Both parties will then understand clearly that they stand in very unequal positions and that the Government is insisting on a special status.
We hold, for these reasons, that the Post Office’s agreement with Aetna should be read to contain the implicit term that, if the Dorchester termination was later admitted or found to be wrongful and if Aetna reasonably incurred excess costs in completing, the Government would be liable to Aetna under the completion agreement for those additional expenses — just as it would be responsible to an outside completing contractor. In effect, Aetna is to be treated, in those circumstances, as if it were such an independent completer. The United States is therefore liable, under the agreement, for Aetna’s reasonable extra costs of completion. With respect to such costs, the agreement will not be construed to leave the defendant scot-free and the surety remediless.[12]
b. In any event, defendant urges that the surety has not proved the reasonableness of its completion costs ($280,427.06), as found by the trial judge. There is no doubt that this amount was actually paid by Aetna to Tredeimick-Billings. We think that this fact of actual payment, together with the supporting testimony, made enough of a showing that the payments were reasonable to allow the trier to accept them, nothing else appearing, and to throw the burden on the defendant of going further if it suspected the coste were *738 too high. Defendant made no effort to show or to suggest that the costs were in any way out of line or unreasonable.[13]
c. The trial judge allowed Aetna certain attorneys’ fees which are challenged by defendant. We agree that these disputed fees were unconnected with the performance of the contract, involving rather the protection of the surety’s own interests, its claims, and its litigation. Under our decisions they are not recoverable. See, Dale Constr. Co. v. United States, 161 Ct. Cl. 825, 831 (1963); J. E. Robertson Co. v. United States, 194 Ct. Cl. 289, 296-97, 437 F. 2d 1360, 1364 (1971); Rash v. United States, 175 Ct. Cl. 797, 810-11, 360 F. 2d 940, 947 (1966): L. L. Hall Constr. Co. v. United States, 177 Ct. Cl. 870, 888 (1966). The same is true for a small travel item of $126.23.
d. The trial judge included in the surety’s damages the amount of $60,500 recovered by the pile-driving subcontractor (Raymond) against Aetna, and paid by the latter. See Part I, B, 2, supra. Though defendant makes some point that this judgment was insufficiently shown, we think the judge could decide that the proof was adequate in the light of defense counsel’s concession on the record of the existence of the judgment. Defendant also cavils that Aetna has failed affirmatively to sustain the litigation as bona fide, but counsel has not challenged the judgment on that score, nor has the Government suggested the slightest reason for doubting the good faith or soundness of the amount awarded. With respect to this particular judgment, we know of no such reason to be wary.
The Government then says that, if the full amount of $60,500 is included in the surety’s award, the United States will pay twice for a substantial part of the work done by Raymond. Raymond’s work was, of course, under the original contract with Dorchester, which had a basic fixed price of *739 $265,000. The total judgment sum of $60,500 consists of $52,000 for Raymond’s efforts plus $8,500 for interest and costs; of this $52,000 the amount of $22,130 was paid by defendant to Dorchester but was never transmitted over to Raymond. See Part I, B, 3, supra. Defendant now argues that the remaining $29,870 must have already been paid to the surety since the contractor and the surety together have received more than $265,000.[14]
One significant flaw in this contention is that the initial contract price has plainly been increased in considerable measure by extras and changes (including a substantial part relating to Raymond’s work), and we cannot at all assume that the full contract price has yet been paid.[15] By the same token, we cannot say that the surety has yet been paid for any portion of Raymond’s work or that if we allow the $60,500 judgment it will receive double payment for the same items. Moreover, the trial judge handled the problem of the $22,130 paid by the Government to Dorchester for Raymond’s work by deducting it from the recovery to which plaintiff would otherwise be entitled. With this provision, we are not persuaded that (with respect to the $60,500 Raymond judgment) the defendant will be or has been required to pay twice for the same work done by Raymond.[16]
We are troubled, however, by the possibility that Aetna may recover twice with regard to this judgment, once through our award to it and then again by executing its District Court *740 judgment over against Dorchester. The surety’s counsel assures us ¡that this will not be done, but we think that there should be more formal protection. We shall therefore provide that payment of Aetna’s judgment here will be subject to the execution of a release, in proper form, of its District Court judgment against Dorchester (and the latter’s principals). Cf., e.g., Jensen v. United States, 158 Ct. Cl. 338, 342, 358, 305 F. 2d 444, 449 (1962).
Ill
The Government has interposed a contingent counterclaim against Aetna, if an award is made to the surety, for those sums previously paid to it which the court now holds should be paid to plaintiff. The trial judge denied this counterclaim, and defendant asks us to reinstate and implement it.[17]
The Government is correct in saying that Aetna was paid after its takeover (at least to the extent of $16,961.97) for work included in the award we are today making to the plaintiff — work which Dorchester actually performed.[18] But this does not mean that defendant is entitled to prevail on its counterclaim against Aetna. As we have held in Part II, A, supra, the surety can properly recover from the Government, under its take-over agreement, the full reasonable excess costs of completion. We have found that reasonable excess to have been $280,427.06, of which Aetna has received only $212,163.80 from defendant; the balance of $68,263.26 is the amount for which the surety still remains uncompensated, but for which it can recover in this proceeding.
If we were to grant the contingent counterclaim to the extent of $16,961.97 — on the ground that this money, in- *741 eluded in the $212,163.80 already paid to Aetna, represented Dorchester’s work for which our judgment is now reimbursing plaintiff — we would be required to perform the balancing operation of increasing the $68,263.26 figure, supra, by the same amount of $16,961.97 to cover the full excess completion cost owed to the surety. The latter is entitled, in other words, to the full $280,427.06 it spent in completion — so as to be made whole — 'and whatever part of that total we take away under the counterclaim we must add to Aetna’s award in order that it end up compensated for the total of its completion loss. As Trial Judge Day indicated, the effect of granting the counterclaim would be to leave the surety uncompensated for a portion of its actual loss — a position which would be inconsistent with our holding that the surety should rightfully be reimbursed for its entire loss (to the extent reasonable).
It is true that a comparable counterclaim was granted in Dale Constr. Co. v. United States, Seaboard Surety Co., Intervenor, supra, 168 Ct. Cl. 692, 732, 851 (1964), for items previously paid to the surety but which were included in this court’s judgment awarded to the contractor. That was a different case, however, in that the contractor was the only plaintiff considered entitled to sue as plaintiff, and the only one to which an award was given; no judgment was entered for the completing surety, the damages suffered by the latter being wholly included in the contractor’s judgment; the surety did not recover on its own behalf.
In that situation, where the contractor is the only recognized suing entity, and theoretically the court is not concerned with the surety, it may be that the surety’s actual damages (in completing the work) have to be offset by the money it received which should have gone to the contractor; otherwise the contractor, which was the only recipient of the court’s award and the only party recognized as entitled to sue here, could possibly receive and retain double payment.[19] The Dale *742 court was intent on making sure that the defendant would in no circumstances have to pay the contractor twice.
In our case, on the other hand, the surety sues on its own behalf and is entitled to recover, as we have held above, in its own name and its own right, under its take-over agreement with the Post Office Department. The award will go directly to it and there is no possibility of the contractor’s receiving or retaining double payment. We hold, for this reason, that the Dale Constr. Co. precedent (whether or not it should be followed in the future on its own facts) is inapplicable here, and the defendant’s contingent counterclaim should be denied.
CONCLUSION
Plaintiff and the surety intervenor are both entitled to recover. The former’s judgment will be in the sum of $63,602-30. The latter’s will be in the amount of $128,763.26, and will be subject to execution of the release referred to in Part II, D, supra, of this opinion. The defendant’s counterclaim against the plaintiff and its contingent counterclaim against the surety will be dismissed.
Findings op Fact
The court, having considered the evidence, the decision and findings of Trial Judge William E. Day, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The petitioner, Michael Carchia, Jr., is the receiver of the estate, property, monies, debits and effects belonging to the Dorchester Equipment Co., Inc. by decree of the Superior Court of the Commonwealth of Massachusetts, dated July 24, 1964.
2. Dorchester Equipment Co., Inc., (hereinafter referred to as the contractor) was incorporated under the laws of the Commonwealth of Massachusetts in 1958 with its usual place of business at 76-78 Shirley Street in the Roxbury district of the city of Boston, and engaged in the business of general construction.
3. The defendant is the United States of America, acting *743 through the Post Office Department, Bureau of Facilities, Division of Real Estate.
4. On July 19, 1961, as a result of competitive bidding, the Post Office Department, Bureau of Facilities, entered into a contract with Dorchester Equipment Co., Inc. The contract, described as “South Postal Annex Addition — Phase 1-A, Dorchester Avenue, Boston, Massachusetts” required the contractor to:
* * * furnish all labor, equipment, and materials and perform all work for demolition, removal of railroad trackage, canopies, etc., necessary to construct footings for a future canopy located * * * at Terminal Annex, South Postal Annex, United States Post Office, Boston, Massachusetts, in strict accordance with the specifications, schedules, drawings, and conditions * * *.
The plans and specifications had been prepared by Peder-sen and Tilney, architects, Boston, Massachusetts.
5. The contract was let out of the Washington office of the Post Office Department and the contracting officer located in Washington was Acting Assistant Postmaster General Sidney O. Bishop (hereinafter referred to as the contracting officer).
6. Under the contract the work was to commence “as soon as possible after the date of receipt of notice to proceed” and was to be completed within “150 calendar days after the date of receipt of notice to proceed.” The completion date, when computed, became December 27,1961.
7. This is a lump sum contract for which Dorchester Equipment Co., Inc. was to be paid the sum of $265,000, adjusted by the unit prices for the number of feet of usable piles actually driven, based upon the base price listed in the lump stun bid.
8. The contract documents consist of the advertisement for bids, information for bids, bid and performance bond, Standard Form 23A (construction contracts), drawings and specifications.
9. The firm of Pedersen and Tilney (with offices at 8 Newbury Street, Boston, Massachusetts) was designated by the defendant as the architect within the meaning of the contract, which term included its representatives (Messrs. *744 Pedersen, Smith and Scott), and subcontract engineers, Goldberg, LeMessurier & Assoc, (agents of the owner) to the extent provided in the contract. Under the contract, the architect:
* * * has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract * * * is, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance * * * [and] shall, within a reasonable time, make decisions of all claims of the Owner, or the Contractor * * *.
10. Dorchester Equipment Co., Inc. (owned and controlled by Gaetano DeLuca) was successor to the family construction firm originally organized over 25 years earlier (by DeLuca’s father) and was engaged in the construction of commercial, mercantile and other buildings, as well as power plants, hospital renovations, sewage pumping stations, bowling alleys, etc., with a total volume of work running, from $500,000 to $700,000 annually for the period from 1945 to 1954.
11. Gaetano DeLuca had been in the construction business with his father, working as an estimator and on general construction site engineering before he enlisted in the United States Marine Corps. After his enlistment, he went to work for the United States Corps of Engineers New England Division, attaining the Civil Service grade of GS-7. His activities included the inspection of construction of hangars, recreation and industrial buildings, installation of machinery, and inspection and direction of pile-driving and foundation work. He took engineering and construction courses held at the United States Corps of Engineers, and the evening division of the School of Engineering at Northeastern University. For the past 25 years he has held (and continues to hold) an A.B.C. license issued by the city of Boston Building Department, permitting his unlimited superintendence of all kinds of buildings and construction.
12. On July 20, 1961 (at a prejob conference held at the office of the architect at the request of William Pedersen and Howard Smith of Pedersen and Tilney), Mr. DeLuca gave an oral resume of his own background in the field of contract *745 construction and of the construction activities of Dorchester Equipment Co., Inc. The architect accepted the qualifications of Gaetano DeLuca, approving him as competent to carry on as the contractor’s superintendent for this work.
13. During the July 20, 1961, prejob conference, Mr. DeLuca outlined to the architect’s representatives (Messrs. Pedersen and Smith) the methods and sequence proposed by Dorchester Equipment Co., Inc. for carrying on and arranging a definite program for the work acceptable to the architect.
14. On July 27, 1961, at another prejob conference held at the Federal Building in Boston, attended by representatives of all departments concerned with the project, the following persons were designated their official capacities under this contract:
(a) Beuben Bichard Fleischbein, designated representative of the contracting officer Sidney O. Bishop. Mr. Fleischbein’s and Mr. Bishop’s offices were in Washington, D. C.
(b) Howard Smith (representative of the architect Pedersen and Tilney), designated project resident engineer.
(c) George Myer, designated representative of the General Services Administration.
(d) E. Paul Zecher, designated representative of the Boston Post Office.
(e) G. E. Slattery, designated representative of the New Haven Bailroad.
15. Within 5 minutes after they left the prejob conference where Howard Smith was designated resident engineer, the architect (Pedersen) told Bobert Scott (another employee) “It is up to you to make sure this job gets built” and indicated that Howard Smith had too many other things to do.
16. The architect’s designation of Bobert Scott “to make sure this job gets built” (without specific duties) was not made known to the contracting officer nor his representative, Fleischbein, at any time during the course of the work.
17. Bobert Scott began his career as a messenger boy for an engineering firm in 1951 and after 3 months was advanced to draftsman. His employment with this firm was interrupted *746 by a 2-year stint in the military. At the conclusion of his military service, he returned to the firm as a draftsman until 1958. Thereafter, he was designated as job captain, which position he held with the firm until 1960. In July of that year he became a job captain with the architect Pedersen and Tilnoy. He had no engineering or construction training and (except for having served as an inspector on one job) he had never served as a resident engineer.
18. In connection with the project in suit, Scott (on behalf of the architect) made the original field investigation. The design of the work was subcontracted to the firm of Goldberg, LeMessurier & Assoc., engineers. Scott physically put the contract documents together by adding various sections furnished to the architect by the engineers and the contracting officer.
19. From August 6,1961, to March 17, 1962, Scott visited the jobsite on the average of once each week. Howard Smith had instructed him to make periodic visits to the site, prepare change orders or whatever paper work was required and to process pay estimates for the contractor.
20. At no time was Scott’s request to the architect and to Fleischbein for a fulltime resident engineer granted. The general provisions, in pertinent part, provide as follows:
* * * workmanship * * * shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during * * * construction * * *.
21. The work under the contract was divided into ten divisions and, for payment purposes, the bid breakdown was as follows:
(a) Demolition and Salvage_$41, 400
(b) Excavation, Grading, Backfill_ 35, 000
(c) Foundations _ 93,000
(d) Concrete - 40,000
(e) Waterproofing _ 2,000
(f) Bailroad Work_ 42,000
(g) Chain Link Fence_ 6,100
(h) Miscellaneous Metals_ 1, 000
(i) Hepairs and Patching_ 1,500
(j) Site Drainage_ 3,000
Total .$265, 000
*747 22. During the discussion of the work progress schedule, the architect (Pedersen and Tilney) authorized the contractor to begin work immediately, before receipt of the contracting officer’s notice to proceed, so that the job could be completed before winter weather set in.
23. All of the work under the “Foundations” category was, with the approval of the architect, subcontracted to Raymond International.
24. On the approval of the architect, the “Chain Link Fence” and snow barrier work was subcontracted to the New England Chain Link Fence Company, and the “Railroad Work” was subcontracted to A. Arcaro and Sons.
25. Prior to the commencement of the work, Messrs. Smith and Scott (for the architect) pointed out to Mr. DeLuca at the project site, bronze discs described as the corner markers of the property lines, relating them to the property lines shown on the project plot plan.
26. The contractor engaged the services of a registered land surveyor (David Kaufman), who made a survey of the property lines of the project site with reference to the bronze discs shown by the architect to Mr. DeLuca, and a layout for the chain link fence and lines for locating the piles to be driven according to the plans and specifications.
27. Beginning on July 31,19,61, and continuing to November 17,1961, without delay attributable to it, the contractor, by engaging sufficient personnel, equipment and materials, undertook the work in accordance with the approved work progress schedule and in a workmanlike manner performed the following work under each division:
(a) Demolition and salvage:
(1) Demolition, removal and disposal of three 85' wide canopies supported by steel stanchions, extending in three 1,100' rows, serving as station platform covers along the railroad tracks.
(2) Demolition, removal and disposal of the three station platforms, consisting of 2' thick concrete slabs, 85' wide and 1,100' long, running between two railroad track lines. The canopies hung over these platforms.
(3) Removal of the building canopy.
(4) All work specified under this item.
*748 (b) Emotivation, grading, backfilling:
Over 90 percent of this work was done, including excavating, backfilling and grading the whole project area of 96,000 square feet, to the plan designated elevations. All that remained to be done in this division of work after November 17, 1961, was finish grade around the beams and pile caps and backfill water line trenches. The fill material was brought to the project site and stockpiled for spreading.
(c) Foundations:
This work, consisting of driving various pipe piles in locations set by the surveyor, was undertaken by Eaymond International. Of the proposed 120 pile locations, 87 were set in place according to the specification requirements, by November 17, 1961. The remaining 33 piles could not be driven in the specified locations and within the specified 1" tolerance because of unknown obstructions encountered during the spudding procedure.
(d) Concrete:
The contractor formed and completed the construction of four reinforced concrete beams — -2, 3, 4 and 7 — and fabricated the wooden forms and steel for the pile caps along column lines A and B, and stored them on the project site. Some wooden forms were built over the pile cap clusters as specified.
(e) Waterproofing:
The 12 tunnel sleeves containing piles penetrating the tiuinel floor were waterproofed by placing 2" to 3" of Embeco Grout D for permanent water seal, according to the type of sleeve and method approved by the architect.
(f) Railroad work:
This work had progressed to the removal and storage of the railroad tracks and ties. The railroad tracks and ties were to be relaid after the completion of all of the other work, in accordance with the plans.
(g) Chaim, link fence [and snow barrier]:
The chain link fence and snow barrier were laid out by the surveyor and the chain link fence and snow barrier were installed according to the specifications.
*749 (h) Miscellaneous metals:
(i) Repair and patching :
(j) Site drainage:
Categories (h), (i) and (j), above, were minor items which were done in part or underway by November 17,1961.
28. On October 20,1961, the architect issued its certificate certifying that for the period from September 15, 1961, through October 15,1961, for work done on the contract, the contractor was entitled to the sum of $135,700 out of the total contract bid price of $265,000.
29. In addition to the work completed under the contract (for which the contractor was credited for payment) was work in progress but not to such degree of completion as would entitle the contractor to payment in connection with the different degree of the fabrication and placement of wooden forms, reinforcing steel and concrete for beams 1-10 inclusive and pile caps on line A, 1-4 inclusive and 9-22 inclusive, on line B, 7-23 inclusive, and other work in progress under the remaining divisions of work.
30. During the period from July 31 to August 31, 1961, the contractor’s work was delayed by an adjoining contractor (Bay State Building Wrecking Company), whose work and debris prevented the contractor from entering the project site and employing suitable mechanical vehicles and equipment, necessitating the use of hand labor and tools, resulting in a more expensive and time-consuming method not contemplated by the contractor. The architect failed and refused to correct the condition, ordering the contractor to proceed in any way it could and to record the time and cost for doing the work and the delay encountered.
31. For the period ending November 17, 1961, and during the course of its work, the contractor encountered changed conditions, consisting of unforeseen subsurface obstructions consisting of large blocks of granite and concrete, which it removed or penetrated on the order of the architect. This work was billed to the Post Office Department on a time- and-material basis and submitted to the architect for the issuance of a change order under the contract.
*750 32. When Raymond International was unable to spud or drive piles in the specified locations due to undisclosed tunnel granite, granite and concrete blocks, and other obstructions encountered during predrilling, that fact was pointed out to Mr. DeLuca, who promptly notified the architect. The architect’s representatives (Smith and/or Scott and/or Hervol) came to the site, and after inspection, ordered the contractor to remove the concrete and granite obstructions on a time- and-material basis. Where the obstructions related to an undisclosed tunnel or other unremovable obstruction necessitating a change in design or relocation of the piles, Pedersen and Tilney (Scott and Smith) would shift the responsibility onto its subcontract structural engineers, Goldberg, LeMes-surier & Assoc. Goldberg, LeMessurier & Assoc. (Hervol) refused to undertake the solution of the problem. The architect and its subcontract engineers (Scott and Hervol) heatedly argued over the responsibility of preparing a needed drawing to show the change for enclosing the undisclosed tunnel roof at beam No. 2. Hervol told Scott: “* * * I am not getting paid for this job, for inspection or for redesign. I want no part of it * *
33. After November 17,1961, the contractor could not perform further work at the project site because of the obstructions and the jobsite’s physical conditions, all beyond the contractor’s control. Raymond International’s pile driving could proceed no further on the then remaining 38 piles (out of a total of 120) due to undisclosed obstructions preventing piles from being driven to within the specified one-inch tolerance required under the specifications.
34. The contractor removed considerable obstructions on the order of the architect, who assured the contractor that the contracting officer would issue a change order bulletin to pay for the extra work involved on a time-and-material basis. Payment of many of these items of claim was not forthcoming for an unreasonable time. The contractor was unconscionably pressured by the contracting officer’s representative (Fleischbein) to withdraw its claims for charges for delays and extra work due to the adjoining work by Bay State Building Wrecking Company, under the threat that its approved pay estimate No. 2 would not be processed.
*751 35. The contractor had relied upon the authority of the architect to issue change orders and acted .thereupon. When (bis method was not obtaining payment results, the contractor refused to proceed further with the removal of obstructions, pending the issuance of a change order bulletin. On the contractor’s direct appeal to the contracting officer in Washington, his representative (Fleischbein) orally ordered that no further obstructions be removed unless directed in writing by the contracting officer in Washington. Dorchester Equipment Co., Inc. proceeded no further with this work.
36. The work of removing obstructions, and other changes in the work, caused an increase in the amount due under the contract and the time required for its performance. No equitable adjustments for time or money were made by the contracting officer. The architect arbitrarily and unreasonably failed and refused to issue bulletins describing the necessary changes, together with revised drawings.
37. The architect and the contracting officer (acting through Fleischbein) unconscionably and unreasonably exerted economic pressures upon the contractor as follows:
(a) Refusal (by Scott) to approve pay estimates submitted by DeLuca unless DeLuca submitted to Scott’s demands that each and every item meet his -approval of value.
(b) Refusal (by Fleischbein) to process for payment pay estimate No. 2, in the sum of $50,000 until the contractor wrote its withdrawal of the two claims for extra work in connection with the debris of the adjoining contractor.
38. No resident engineer representing the architect was present nor assigned to the project site during any of the work, compelling the contractor to request the attendance of the architect whenever an underground obstruction was encountered.
39. On October 25, 1961, and on October 30, 1961, the architect issued letters and attached transmittal memoranda and drawings, entitled “Change Order No. 1” and “Change Order No. 1 Revised.” Under change order No. 1, revised, the contractor was ordered to revise the dimension from the west property line to column line A from 15' 0" to 15' 6" *752 and the dimension from column line 1 to center line of existing column 1, from 8" to 5".
40. Upon receipt of the above-mentioned change orders, the contractor asked its land surveyor (Kaufman) to cheek out the layout. Upon completion of the check-out, the contractor immediately notified the architect that the new dimension would throw out of line all of the work already completed.
41. On November 1,1961, at the project site, Mr. DeLuca pointed out to the architect (Scott and Hervol) that the discrepancy created by the aforesaid change orders dislocated the four beams already constructed, the pile caps, the wood formed and reinforced steel and the 87 driven piles, beyond the one-inch tolerance allowable under the specifications.
42. When DeLuca discovered the difference between the original measurement and that shown on the change orders, he promptly submitted it to the architects (Smith and Scott) who then engaged the services of Crocker Associates (surveyors) to make a thorough survey of all of the work in place.
43. The dimensional error discovered by Crocker Associates changed the location of all of the piles and beams already installed, necessitating a redesign of all of the pile caps and beams to meet the changed dimensions and to utilize the 87 piles already driven.
44. The 15-foot measurement shown on the original plans and the change in dimension of the overall distance shown as 587'2" on the original plans, to 590' on the revised plan, were errors caused by Goldberg, LeMessurier & Assoc, (subcontractors for the architect) and were not discovered during the architect’s design for the structure to be supported by the work under the contract in suit. The error was not discernible on the original plans and specifications, but became obvious to the architect during the design of phase 2 of the project and prior to the issuance of change order No. 1 revised on October 30,1961.
45. The architect issued change order No. 1 revised knowing of the mistake, but never disclosed it to the contractor. The architect sought unfairly and unconscionably to conceal *753 its responsibility by revising change order No. 1, without revealing or disclosing the serious consequences to the work already laid out and installed.
46. On November 10, the contractor informed the contracting officer (Fleischbein) of the error and was instructed (by telephone from Washington) to do no further work until Fleischbein arrived at the project site on November 17.
47. The architect told Fleischbein of the errors. Fleisch-bein distorted the true cause of the mistake to the contractor and sought to lay the blame on the contractor and to force the contractor to assume a part of the expense for building a new beam alongside beam No. 7.
48. The change in the dimensions (15'0" to 15'6" and 8" to 5") ordered in change order No. 1 and change order No. 1 revised, necessitated the deletion of beam No. 1 already constructed and the redesign of the cluster of piles it contained.
49. The changed dimensions changed the centerline of column locations on lines A and B, placing 90 percent of the 87 piles already driven into the ground substantially outside tb e specified one-inch tolerance.
50. The changed dimensions necessitated the elimination or modification of concrete beams No. 2,3,4 and 7, already in place, in order to properly carry the columns to be supported thereon in the proposed phase 2 contract. .
51. The changed dimensions necessitated the removal and reforming (wood) and placement of reinforcing steel on ten pile caps already in place on the west property line and column lines A and B in order to properly carry the proposed columns.
52. The changed dimensions necessitated the modification and change in design of pile caps not formed (wood) in order to support the proposed columns.
53. On November 1, 1961, at the project site, Scott and Hervol made light of the situation and orally directed the contractor to construct an extra beam, design and install extra piles, remove and relocate steel dowels on the beam and not to be concerned with the future column on phase 2. Mr. DeLuca refused to undertake any of the changes until the contracting officer issued a proper written change order.
*754 54. Instead of issuing a bulletin describing the necessary change or changes with revised drawings, the architect on November 7,1961, sent a letter to the contractor ordering the removal of concrete beams No. 2, 3, 4 and 7, stating that the contract provisions for shop drawings for the reinforcing steel had not been conformed with.
55. The contract specifications (page 4-1, para. 3(c) and page 4-14, para. 14(e)) clearly called for shop drawings, for reinforcing steel (for concrete reinforcement) to be submitted to the architect before fabricating. At the prejob conference on July 27, 1961, the matter of shop drawings for reinforcing steel was discussed. While there is a conflict in the testimony concerning this matter, the credible evidence is that the contractor through its president, requested permission to purchase straight reinforcing bars and have them bent at the site in accordance with the detail shown on the contract drawings, and this permission was granted. The granting of such permission was in effect a waiver of the requirement for shop drawings. Thereafter, straight bars were delivered to the jobsite and bent at the site by the steel workers. No shop drawings were submitted for approval.
56. The architect’s issuance of change order No. 1 (on October 25,1961) and change order No. 1 revised (on October 30,1961), created a “calamity of errors” between the architect and its subcontract design engineer, Goldberg, LeMessurier & Assoc. The changing of the measurement of the distance from the west property line to the center of the column line from 15'0" to 15'6", displaced the position of beams No. 2,3,4 and 7 already in place and beams No. 5 and 6, then resting on the tunnel walls and approved for payment.
' 57. Engineer Hervol, of Goldberg, LeMessurier & Assoc, (designers of the piles, the pile caps and beams), inspected the jobsite during the construction of these structures and reported in writing to the contracting officer on October 19, 1961, that beams No. 3, 4 and 7 were “all framed and ready for concrete.”
58. The architect arbitrarily and willfully sought to shift onto the contractor the blame for the displacement of beams Nos. 2, 3, 4 and 7, caused by the revised measurements set *755 forth in change order No. 1 revised. The architect capriciously invoked the shop drawing requirement, well knowing it to have been waived, and that the reinforced steel was inspected in the forms by Scott and Hervol as conforming to the steel detail shown on exhibit 2, sheets 2 and 3, before concrete was poured.
59. On November 17, 1961, a conference was held at the site of the work. The architect’s representatives prepared a memorandum of the conference which is in evidence as defendant’s exhibit 17. This memorandum records the important matters discussed at the meeting and is quoted in full below:

Conference at Site

November 17,1961 9:30 a.m.
Phase 1-A
South Postal Annex Addition
Boston, Massachusetts
Attended by:
Mr. Zecher — Eegional Post Office Department
Mr. Pleischbein — U.S. Post Office Department
Mr. Slattery — New Haven Eailroad
Mr. DeLuca — Dorchester Equipment Co., Inc.
Mr. Anderson — Dorchester Equipment Co., Inc.
Mr. Pedersen — Pedersen and Tilney
Mr. Smith — Pedersen and Tilney
Mr. Scott — Pedersen and Tilney
Mr. Hervol — Wm. J. LeMessurier and Associates
Mr. Collins — Wm. J. LeMessurier and Associates
1. Temporary signals at Tracks No. 23 and 24 cost $950.00 to be assumed by Post Office Department. Mr. DeLuca is to remove ties and crush stone at Tracks 23, 24, and 25 to allow for passage of the trains. The above materials installed by Mr. DeLuca are for temporary road to the site.
2. Mr. DeLuca shall pay all necessary fees for Flagman as required by New Haven Eailroad.
3. Mr. DeLuca was informed that he must submit shop drawings, material test and give notice to Architect before placing concrete.
4. Mr. DeLuca is responsible for the exact location and elevations of elements, as shown on drawings. A Eegis-tered surveyor is required to determine the above locations.
*756 5. Relocation of piles, which, cannot be driven according to the tolerances required in the specifications, shall be installed according to amended specifications to be, issued by Mr. Collins. Mr. DeLuca is to employ a Registered Engineer to determine new pile locations and submit drawings to the Architect for redesign of pile caps. Payment of extra moneys due to pile relocation shall be on a time and materials basis. (Notification and approval required from Architect upon commencing this wort) Mr. DeLuca is to include the Architect’s and Engineers’ fees required for the pile caps’ redesign.
6. Mr. DeLuca is to submit certified proof of pile caps’ cost after they are in place. (Inspector to sign.) Mr. DeLuca is to submit unit price for spudding in lieu of predrilling at the November 28, 1961, Conference.
7. Upon completion of pile driving operations and receipt of Surveyor’s report on location, the Architect shall prepare necessary drawings for redesigned pile caps.
8. All obstructions to be removed shall be paid on a time and materials basis. Approval will be confirmed in writing by the Post Office Department.
9. Mr. DeLuca will not proceed any further with his contract until all piles are placed and locations are given to Architect.
10. The exact location of dowels for future columns are Mr. DeLuca’s responsibility.
11. Mr. DeLuca shall submit certified vouchers on all expenses incurred during removal of concrete box obstruction at Beam No. 6 before payment is made. This obstruction is not on a time and a materials basis.
12. Letter to Mr. DeLuca authorizing him to proceed with Change Order No. 1 and 2, as submitted October 80, 1961; and unforseen obstructions below subgrade on a time and materials basis. Architect to be notified and represented at site before commencing work.
13. Mr. DeLuca to secure concrete test reports from an independent Testing Company (not the Concrete Company).
14. Thompson and Lichtner’s field inspector shall take sample test before concrete is poured.
15. Concrete in place without shop drawings or steel inspection.
a. Reinforcing placed by design drawings and fabricated on the site. Mr. DeLuca stated that Mr. Hervol gave permission to pour retaining walls without shop drawings.
Mr. DeLuca shall prove to the Architect by de *757 livery certificates of reinforcing steel and concrete, men’s time slips and equipment time, and certified papers that the work is done according to plans and specifications.
b. Mr. DeLuca shall prove the capabilities for supporting design loads on Beams No. 2, 3, and 4 by a load test. The means of load testing shall be approved by Mr. Collins. Mr. Collins shall be present during the load test. Mr. DeLuca shall pay all load test expenses including engineering fees. Mr. DeLuca shall submit his proposal at the November 28, 1961, Conference.
c. The locations of stubs for Columns B-2, B-3 and B-4 are not the size and spacing required by plans according to report submitted by William S. Crocker, Inc., independent surveyors._ The stub size can be changed after proof is received that the Beams are satisfactory by load testing.
d. Beam No. 7 shall be removed and replaced in ■location required by plans. This work shall be done at the Contractor’s expense. The Beam is now 2' to 3' east from plan location and interferes with the railroad layout.
e. Aluminum snow guard on the chain link fence is not acceptable to the Post Office Department. Mr. DeLuca installed snow guard without prior approval by Architect. No samples submitted.
f. Do not send pile reports to the Boston Building Department. They will be submitted in one complete package when building permit for new building is issued. v
g. Post Office Department gave Mr. DeLuca twenty-four “No Trespassing” signs to be secured to chain link fence. No work done to date.
h. Beam No. 6. Prepare drawings for Change Order No. 3 to show an acceptable means for securing existing steel deck to Beam. Price to be submitted and approved by the Post Office Department before proceeding with work. Delete Beam No. 6 from Change Order No. 1, dated October 30, 1961.
i. Mr. DeLuca shall install project sign at the south side of entrance through the chain link fence.
j. Mr. Zecher would like to know if permission has been requested from G-.'S.A. to install new 8" steam line on their property.
16. Next conference to be held November 28,1961, at 2:00 o’clock at the site.
17. Conference adjourned at 1:15 p.m.
*758 60. Despite the fact that the contract authorized the contracting officer to order changes in the work, instead of receiving a direct order in writing from the contracting officer, the architect purported to issue change orders calling on the plaintiff to incur extra cost. It was clearly known to the contracting officer and the architect that obstructions which were encountered in the driving of piles necessitated the removal of such obstructions before 33 piles could be driven. The presence of such obstructions interfered with the work of plaintiff’s pile-driving subcontractor, causing it to incur delay cost which it called upon the plaintiff to pay.
61. At a meeting on November 28, 1961, the plaintiff advised Fleischbein and the architect that it would proceed with removal of the underground obstructions upon receipt of a written order from the contracting officer. Fleischbein, at this meeting made the statement that he did not care if the questions involved at this meeting were not solved until next July.
62. At another meeting held at the job site on November 29th, Fleischbein showed DeLuca a copy of an undated letter bearing the signature of the contracting officer, (Sidney O. Bishop), proposing the manner of overcoming the conditions and causes which brought the work to a halt.
63. The contracting officer’s letter (undated), received by the contractor, on December 4,1961, confirmed the oral agreement of the parties at the November 17th meeting, that the method and procedure for the remaining work was as follows:
(a) Load testing of beams Nos. 2,3 and 4, in accordance with an approved testing program;
(b) Beam No. 7 to be “abandoned” and clear from interfering with railroad clearance, and reconstructed in the location according to Change Order No. 1 Devised;
(c) The architect-engineer to proceed with a redesign of the pile caps and dowels for future columns and to check the reinforcing steel and dowel location designs;
(d) All future shop drawings, laboratory tests, proper inspection, etc., as established by the plans and specifica--tions must meet the requirements prescribed by tb{„ specifications. (Emphasis added). ®
*759 (e) Change orders for work previously authorized and/or accomplished will be processed by the architect in accordance with the contract’s Special Provisions.
(f) The contractor to remove obstructions (before driving the 33 remaining piles) on a time and material basis, certified by the architect’s resident engineer designated by the architect, who will direct the areas where the obstructions are to “be removed”. This procedure was an open ended change order, a written order to proceed with payment on a time and material basis necessary to expedite the removal of an unknown quantity and extent of the obstruction.
(g) Pedersen and Tilney was to notify the contracting officer by telegram of any violations of the plans and specifications or failure of the contractor to “correct” its work.
64. It was within the authority of the contracting officer to order the suspension of all work under the original contract, and to order the contractor to engage solely in the work of removing the unknown obstructions to the remaining 33 piles.
65. The work ordered to be done by the contracting officer’s undated letter shown to DeLuca on November 29,1961, was necessitated or occasioned by:
(a) The architect’s change in the dimension of the column lines from 15'0" to 15'6" and 5" to 8"; and
(b) The unknown obstructions encountered during the pile driving.
66. The contractor promptly submitted to the contracting officer the information relative to the changed measurements furnished to it by the architect.
67. The contracting officer arbitrarily and capriciously failed to promptly make a determination in writing concerning the discrepancy.
68. In violation of its agreement of November 17th, confirmed in the contracting officer’s undated letter, and the conference of November 28th, the contractor was prevented from entering upon the project site because of the Christmas mail handling operations surrounding the project site.
69. On November 30, 1961, the architect (William Peder-sen and Mr. Zecher visited the project site), authorized the |Post Office Mail Department to take over the project site, *760 excluding the contractor from further work during the 1961 Christmas mail handling.
70. On the contractor’s appeal to the architects (Peder-sen and Smith), it was informed that there was nothing they could do until after the mail requirements were complete.
71. From December 1,1961, to January 10, I960, the contractor was prevented from entering upon the construction site to perform its work by reason of the Post Office Department’s :
(a) Blocking the only equipment access to the project site designated in the plans and specifications, from Dorchester Avenue, by a padlocked chain and prohibition of the Postal Inspectors guarding the entrance, “* * * They don’t want you on the site on account of the mail trains. You will get a letter * *
(b) Kemoval of the ballast railroad ties and gravel originally installed by the contractor for passage, covering railroad tracks Nos. 23 and 24, over which vehicles had to cross from Dorchester Avenue to the project site. They, the Post Office Department, removed the cross-over with its own forces.
(c) Fifty railroad mail cars backed out of the adjoining South Postal Annex Building and extended across the access road, 2,000' beyond the bridge.
(d) Storage of mail carts throughout parts of the project site and parking of employee’s autos in front of the entrance.
(e) Commandeering the contractor’s construction office trailer for use as a Postal Inspector’s lookout, excluding the contractor from its use.
No alternative access to the job site was provided or available for the contractor’s use.
72. The contractor’s attorney conferred with the architect (Smith), and communicated in writing with Fleischbein and the contracting officer (Bishop). He was instructed not to proceed with any work pending a conference, to be attended by all parties and scheduled for January 24,1962. The contractor was not permitted to resume work after January 10, 1962 (upon receipt of the key). The architect stated that the matter was referred for decision to James Lowe of the Office of Engineering of the Post Office Department. On Janujj ary 11, 1962, James Lowe stated that the matter was beiifl *761 reviewed by Post Office General Counsel, and, on January 17, 1962, the contracting officer scheduled a conference for January 24, 1962, at the architect’s office, “ * * * to resolve the matter * *
73. At the January 24, 1962, meeting, it was agreed between the parties that:
(a) Frank Fogarty be the resident engineer representing the architect, and he will designate the location of obstructions to be removed;
(b) The contractor shall employ labor and equipment to remove designated obstacles;
(c) Fogarty to record the hours of labor and equipment hours engaged by the contractor in this work;
(d) The contractor submit its billing weekly, based upon Fogarty’s certified statement of labor and equipment employed in the work;
(e) Work to commence on February 5,1962;
(f) After removal of all obstructions, as determined by Fogarty, the contractor will then cause the driving of the remaining piles on locations designated by Fo-garty;
(g) After all piles are driven as directed by Fogarty, the contractor’s registered surveyor to make a land survey of the site, showing all piles driven, and structures, beams and pile caps already in place or fabricated. The survey to be turned over to Pedersen and Tilney and its subcontract structural engineer;
(h) Pedersen and Tilney, architects, will redesign the beam and pile cap system to conform to the location of the piles in the ground;
(i) The contractor to do no work on its original contract -until the Architect’s redesign has been completed;
(j) The contractor’s statements of its charges for the work of removing the obstructions (weekly), and on a time and material basis, as certified by Fogarty, will be processed for payment, and the contractor to be reimbursed the costs or its registered surveyor.
74. At the January 24th meeting, Fleischbein arbitrarily and unreasonably ordered all of the work to be completed by March 1st, and capriciously threatened default without the opinion of the architect, or knowledge of the project conditions.
75. On February 1, 1962, counsel notified the architect that the contractor was ready to commence the work of re *762 moving obstructions on February 5,1962, according to their understanding at the meeting held on January 24,1962, and was awaiting the architect’s designation of their resident engineer.
76. On February 2,1962, the architect designated Fogarty as its resident engineer for the removal of obstructions with work to begin on February 5,1962.
77. On February 12, 1962, the contracting officer sent the following letter to the plaintiff:
This refers to my previous letters to you of November 30,1961, and January 17,1962, regarding the above contract and the conference on January 24,1962, in Boston, Massachusetts.
Relocation of the piles, if the obstruction cannot be broken or moved, will be accomplished pursuant to Paragraph 9 (a), page 3-6 of your contract. As I advised you in my letter of November 30,1961, removal of obstacles precluding pile driving will be paid for on a time and material basis certified true and correct by the Architect-Engineers. As agreed at the conference and as you were heretofore notified by Pedersen and Tilney, a field representative, probably Mr. Fogarty, will be available for assistance in siting the piles. For your information Mr. Fleischbein of this Department is the Project Manager for this facility and I expect you to fully cooperate with him as my representative.
Moreover, as discussed in the conference on January 24, 1962, and my letter of November 30, 1961, you will be required to correct the deficient work which includes but is not limited to proper location of Beam No. 7, correcting of safety violation, test program for reinforcement work on Beams 2, 3,4, and 7 and shop drawing for chain link fence.
It is imperative that you submit shop drawing for the work in accordance with your contract.
As you agreed at the conference, you will furnish a schedule of your procedure for completion of the subject contract and an estimated date of completion. This schedule and completion date must be immediately submitted.
I must reiterate that it is also imperative that this contract be completed without any additional delay. At this conference, you agreed to resume working on or about January 31, 1962. This requires substantial work to be accomplished and the prosecution of the same to *763 assure early completion. Any more delay in this regard will require my invoking Clause 5(a) General Provisions.
Moreover, it has been called to my attention that you failed to build the railroad cross over ramp in accordance with your contract requirements resulting in an accident on February 7, 1962. This incorrect construction should be remedied at once and I have instructed the Architect-Engineers, Pedersen and Tilney, to direct you to immediately correct this work.
78. On February 16, 1962, the contractor complied with the contracting officer’s request for a revised work progress schedule, by setting forth in great specificity a step-by-step schedule of each item of work, and an estimate of the time to perform, test and survey the work remaining to be done under the contract. The progress of the work was dependent upon the direction of the engineer in the removal of the obstructions. The architect-engineers were required to redesign beams and pile caps after they received a land survey of all the piles driven. A definite time for completion was dependent upon conditions and redesigns not discernible or known at the time. The determination of a completion date was fraught with probabilities not in control of the contractor.
79. The contractor engaged in the work of removing the obstructions under the constant direction of Fogarty, beginning on February 5, 1962, continuously to March 17, 1962, under the severest winter conditions suffered in Boston in 28 years, with frost penetrating 3' into the ground, necessitating the purchase of hot sand from asphalt plants, and pneumatic drills (jack hammers) to cut through the frost. Only y2 day during that period was lost due to a severe snow storm. Fogarty designated the obstructions to be removed and recorded the labor and equipment employed in the work. At the end of each day, he furnished the contractor a copy of his daily breakdown of labor and equipment. At the end of each week, the contractor prepared and submitted its billing, based upon Fogarty’s certified daily breakdown.
80. Prior to March 15, 1962, the contractor prosecuted the work of removing the obstructions with diligence and in full cooperation with the direction of the architect. The con *764 tractor’s work was continuous and not delayed by any causes attributable to it. The removal of the unforeseeable obstructions not contemplated under the contract, was such fact as would entitle the contractor to an extension of time and equitable adjustment of costs under the contract.
81. The architect sent a series of letters to the contractor, showing approximately 30 redesigns and modifications occasioned by the changes in the measurements as set forth in change order No. 1, for work done or to be done, without issuing a bulletin describing the necessary change or changes nor providing equitable adjustments of time for completion or additional compensation.
82. The 30 changes and modifications sent to the contractor were changes in drawings and specifications, caused by the change in the measurement of Column Lines A and B from the West Property Line, from 15'0" to 15'6", and to changes in pile locations due to unforeseen underground obstructions.
83. The 30 changes and modifications (Exhibits 18 to 39 inclusive) require an equitable adjustment, increasing the amount due under the contract, and the time for its performance, for which the architect failed to issue bulletins.
84. By March 8, 1962, the plaintiff had removed 90 percent of the underground obstructions. This fact was reported by the architect to the contracting officer at a meeting at the site that day. The plaintiff advised that it had notified Raymond International, its pile-driving subcontractor, to resume pile-driving operations, stating further that if they do not show up, another firm would be hired to do the pile driving. While there is some confusion in the record as to Raymond, it is clear from the entire record that the work of that firm was disrupted and made much more costly to it by reason of the underground obstructions it encountered when driving piles. Whenever an obstruction was encountered in its attempt to drive piles, it had to move its rig to another location and try again. This resulted in the submission by it to the plaintiff of a claim for standby time, Since the plaintiff was never paid for such an extra it was in no position to pay this amount to Raymond.
*765 85. Despite tlie fact that the plaintiff was required to do a great deal of extra work in locating and removing underground obstructions which had interfered with the driving of the remaining piles for which an extension in contract time was indicated, the contracting officer, by letter of February 23,1962, at the urging of Fleischbein, threatened to declare the plaintiff in default and terminate the contract unless the pile-driving subcontractor, Eaymond, returned to the job on or before February 26, 1962. The contracting officer was of the view, unrealistically that the completion date of the contract was still December 21,1961. The contracting officer’s demand was unreasonable for several reasons, first that the location and removal of the obstructions would interfere with the work of driving of the piles. The work of removing the obstructions was practically completed and had, in the face of extremely severe winter conditions, been proceeding with dispatch with no complaint from the architect and was due for completion by about March 15,1962.
86. The architect had made no recommendations that the contract be terminated for default.
87. On March 15,1962, the contracting officer sent the following letter to the plaintiff by certified air mail:
Ee: Contract of July 19,1961
Boston, Massachusetts
Terminal Annex
This refers to my previous letters to you of November 30,1961, January 17,1962, February 12, 1962, and February 23, 1962, regarding the above contract, the conference on January 24, 1962, in Boston, Massachusetts, and your letter of February 16, 1962.
You failed to prosecute the work with diligence and complete said work on or before December 21, 1961, in accordance with your contract. Since that date you have again failed to prosecute the work with diligence. Moreover, my letter of February 23,1962, outlined a deadline of February 26,1962, for your obtaining the services of your major subcontractor, Eaymond Concrete Pile Company, whose services are necessary for speedy completion of the contract. This constitutes a further failure on your part to proceed with diligence.
Accordingly, you are declared in default of your contract, and your right to proceed with performance of said *766 contract is terminated. I have so advised your surety by a copy of this letter.
The Government reserves the right to cause said contract to be completed, and you will be held liable for any excess cost.
The Government also reserves the right to remedies provided by law under said contract in addition to charging excess costs.
This letter constitutes a final decision and is appealable pursuant to the provisions of paragraph 6, Dispute General Provisions, of your contract.
88. The letter quoted in the foregoing finding was received by the plaintiff on March 16, 1962, after office hours, by a visit to the post office, having received a notice of attempt to deliver special delivery mail earlier.
89. The contracting officer sent a copy of the letter quoted in finding 87, to the plaintiff’s surety:, Aetna Casualty and Surety Company, intervening petitioner herein with a letter of transmittal of the same date (March 15) stating that speedy completion of the contract work was essential in order to assure commencement and completion of the entire postal facility.
90. The intervenor, the Aetna Casualty and Surety Company, is a corporation incorporated under the laws of Connecticut. Its principal place of business is in Hartford, Connecticut.
91. The intervenor is surety on the performance and payment bonds furnished by the contractor, Dorchester Equipment Co., Inc., in connection with the construction contract described in paragraph 3 of the original petition, in compliance with the Miller Act, Title 40, United States Code, Section 270a.
92. On July 11,1961, Dorchester Equipment Co., Inc., in consideration of the intervenor’s becoming surety as above stated, executed the “Application for Contract Bond and Agreement of Indemnity” (Ex. A, annexed to petn.), which contains the following provisions:
Second: The indemnitor (s) will at all times indemnify and keep indemnified the Company, and hold and save it harmless from and against any and all damages, loss, costs, charges and expenses of whatsoever kind of nature, *767 including counsel and attorney fees, whether incurred under retainer or salary or otherwise, which it shall or may at any time sustain or incur by reason or in consequence of its suretyship or procurement of suretyship in connection with all bonds or similar obligations referred to hereinbefore, or which it may sustain or incur in connection with any litigation, investigation, collection of premiums, or other matter connected with such suretyship, including any suit instituted to enforce the obligations of this agreement of indemnity; and the in-demnitor (s) will pay over to the Company, its successors and assigns, all sums of money which it or its representative shall pay or cause to be paid, or become liable to pay on account of such suretyship, and on account of any damages, costs, charges and expenses of whatsoever kind or nature in connection therewith as aforesaid, such payment to be made to the Company as soon as it shall have become liable therefor, whether it shall have paid out such sum or any part thereof or not, and said Company is hereby authorized to prove such expenses, costs and attorney fees, in any action or proceeding and to include the same in any judgment * * *.
Third: That for the better protection of the said company, and as of the date hereof, the undersigned in-demnitor (s) who are named as principal (s) in said bond do hereby assign, transfer and convey to the said company all rights, title and interest in and to all the tools, plant, equipment and materials of every nature and description that the said principal (s) may now or hereafter nave upon said work, or in or about the site thereof, or used in connection with the work and located elsewhere, including as well materials purchased for or chargeable to said contract, which might be in process of construction or storage elsewhere, or in transportation to said site, hereby assigning and conveying also all rights in and to all sub-contracts, which have been, or may hereafter be entered into, and the materials embraced therein, and the said principal (s) authorize and empower said company, its authorized agents or attorneys, to enter upon and take possession of such tools, plant, equipment, materials and sub-contracts, and enforce, use and enjoy such possession, upon the following conditions viz.: This assignment shall be in full force and effect as of the date hereof: (1) Should the principal(s) fail to pay any premium charge when due, or should they fail or be unable to complete, in accordance with its terms, any contract covered by a bond of this *768 Company, or in the event the said principal (s) abandon the work under, or fail to comply with the terms or conditions of, any such contract. (2) If the said principal, being an individual, dies, absconds, is a fugitive fi’om justice or is convicted of a felony. (3) If the principal (s) fail to pay bills incurred on the work, when they become due and payable, whether the company may be liable for such bills or not. (4) If any proceedings are brought against the principal(s) alleging that they are insolvent, or if any receiver or trustee for the benefit of creditors is appointed, whether such principal (s) are insolvent or not. (5) If any proceedings are brought which deprive the principal (s) of the use of any part of the. equipment used in connection with the work under their contract so as to hinder, delay or impede the normal and satisfactory progress of the work.
Fourth: That the said company, as surety on said bond, as of this date, shall be subrogated to all rights, privileges and properties of the principal (s) in said contract, and said principal (s) do hereby assign, transfer and convey to said company all the deferred payments and retained percentages arising out of this contract, and any and all monies and properties that may be due and payable to principal (s) at the time of the happening of any of the occurrences mentioned in clauses one, two, three, four and five of the next preceding paragraph, or that may thereafter become due and payable to said principal (s) on account of this contract or on account of extra work or materials supplied in connection therewith, hereby agreeing that all such monies and the proceeds of such payments and properties shall be the sole property of the said company, and to be by it credited upon any loss, damage, charge and expense sustained or incurred by it as above set forth under any bond of suretyship it has executed for the undersigned principal (s).
93. On March 15,1962, the defendant acting by Sidney W. Bishop, Acting Assistant Postmaster General, declared the contract in default and notified the contractor in writing that its right to proceed with performance of its contract was terminated. A copy of that letter was sent to the intervenor together with a letter addressed to the intervenor, copies of which are annexed to the petition marked “B” and “C” respectively. This was the first notice that the intervenor received that the Government had defaulted the Dorchester Equipment Company.
*769 94. The intervenor’s representative, Peter O’Loughlin, met with Fleischbein, the project manager, Robert B. James, Esquire, of the office of General Counsel of the Post Office Department, and Messrs. Smith and Scott for the architect, Pedersen and Tilney, at the architect’s office, March 20,1962. He was told that the work had to be done rapidly because of the work on Phase II superstructure, which had to get underway. O’Loughlin was told that beams Nos. 2, 3,4 and 7 were defective and had to be demolished, and that the measurement for Column Line A was wrong, placing all piles driven outside the allowable one-inch tolerance, and which mistakes were attributed to the contractor. He was told that there had been delay in the prosecution of the work.
95. O’Loughlin also visited the site of the work with Fleischbein, who pointed out work which he said was defective.
96. Following negotiations between the defendant and the intervenor an agreement was entered into between them which was contained in a letter from the intervenor to defendant on May 1,1962, which was approved and accepted in writing by the defendant. This letter agreement provided as follows:
“Your letter of March 15,1962 advised us that Dorchester Equipment Company, Inc. defaulted its above captioned contract with the United States of America and that you have terminated that contract as of that date for proper contract cause and that you are calling upon this Company as surety on the Performance Bond to arrange for the completion of the remaining work.
“In compliance with your request, The Aetna Casualty and Surety Company is prepared to contract with The Treden-nick-Billings Company, 10 High Street, Boston, Massachusetts for the prompt completion of the remaining work as required by the contract and specifications and with the understanding that the United States of America agrees and will pay to The Aetna Casualty and Surety Company the entire contract balance of the Dorchester Equipment Company, Inc. contract, plus all extras, if any; such payments to be made to The Aetna Casualty and Surety Company and in *770 the same way and to the same extent as provided by the original contract.
“The foregoing shall be without prejudice to any claims the United States of America may have, or may hereafter acquire, against Dorchester Equipment Company, Inc., arising out of the contract, and also without prejudice to any claims the Dorchester Equipment Company, Inc. may have against the United States of Aonerica arising out of said contract.
“If this meets with your approval, kindly execute a copjr of this letter in the space provided below, and the same will constitute an agreement between us.”
97. The arrangement described in the foregoing letter was carried out. The intervenor entered into a contract with The Tredennick-Billings Company, which was embodied in a letter dated May 1,1962, from the intervenor to The Tred-ennick-Billings Company and accepted in writing by the latter on May 8,1962, a copy of which is annexed to the petition marked “Exhibit E”. Said contract covered uncompleted and corrective work as directed by the defendant, including certain changes in design necessitated by the improper layout of the project. The Tredennick-Billings Company started work on or about May 14, 1962, and completed the contract with some extra work, with some excusable delays, on or about November 1,1962.
98. The intervenor in the performance of said contract expended the sum of $280,427.06, against which it has received from the defendant the sum of $212,163.80, leaving a difference of $68,263.26. The intervenor’s costs of completion were reasonable.
99. A Miller Act suit in the name of USA for the use and benefit of Baymond International, Inc., d/b/a Baymond Concrete Pile Division was brought against the Aetna Casualty and Surety Company in the United States District Court, District of Massachusetts, number 62-507-W, alleging that it entered into a subcontract with Dorchester Equipment Co., Inc., wherein the plaintiff agreed to furnish labor and materials and drive piles for the foundation of the proposed structure at the South Postal Annex; that pursuant *771 thereto plaintiff supplied labor and materials and performed much work including the driving of a large number of piles; that in addition, with the knowledge and consent of the Dor-chester Equipment Co., Inc., plaintiff performed extra work necessary for the prosecution of the job and further as a result of the failure of the Dorchester Equipment Co., Inc. to meet its obligations under the contract plaintiff suffered considerable delay in its operations and incurred considerable expense thereby. Plaintiff’s complaint further alleged that Dorchester Equipment Co., Inc., refused and neglected to pay the plaintiff anything under its contract although it had received substantial payment from the USA. Plaintiff claimed against the Aetna Casualty and Surety Company pursuant to the Miller Act, Title 40, United States Code, §§ 270a-d. Dorchester Equipment Co., Inc., Gaetano P. DeLuca and Angelina L. DeLuca were made party defendants and eventually under an agreement for judgment entered into by the parties, judgment was entered for the plaintiff against the Aetna Company for $60,500, which the Aetna Company paid, and judgment was entered for the Aetna Company against Dorchester Equipment Company and the two DeLucas, which has not been paid.
100. The intervenor has expended for legal and incidental services, including attorneys’ fees sustained and incurred by reason and in consequence of its suretyship in this matter, the following:
(a) Travel expenses on three occasions of Eugene F. Miller, Assistant Secretary of the Aetna Casualty and Surety Company from Hartford to Boston and return in connection with the negotiations with the Post Office Department after the Department’s default of the contractor, in the sum of $126.23.
(b) For legal services and disbursements of Ely, Bartlett, Brown & Proctor for services for the most part performed by Attorney Edward O. Proctor, the sum of $11,915.81.
101. Employment of counsel was made under the following conditions:
When Aetna was notified of the default Mr. O’Loughlin of the Boston office was requested by his home office to obtain the *772 services of Attorney Proctor to assist him in the handling of this matter, more specifically, the legal techniques of its handling. These included various conferences that Mr. Proctor had with Mr. O’Loughlin ¡and other agents and employees of The Aetna. Company to obtain his opinion as to how they should act and in what form they should set out various documents. Mr. Proctor acted as Mr. O’Loughlin’s supervisor as far as legal matters were concerned.
102. Later services were performed by said counsel in connection with litigation arising out of the situation, as indicated on the attorneys’ various bills. All these bills were accepted by the intervenor as reasonable and were reasonable and were paid. These bills are as follows:
(1) December 10, 1962 — Fee-$2, 500. 00 Disbursements _ 15.81
Total (entire bill claimed)- 2, 515.81
(2) March 11, 1964 — Fee- 2,000.00 Disbursements _ 42.20
Total (entire bill claimed)_ 2, 042.20
(3) December 3,1964 — Fee- 4,000.00 Disbursements _ 171.44
Total_ 4,171.44
(Eliminating the disbursements and dividing the fee 50/50, Petitioner claims only $2,000 on this bill)
(4) September 20,1965 — Fee- 2,000.00 Disbursements - 11. 52
Total (entire bill claimed)- 2, Oil. 52
(5) April 27, 1967 — Fee_ 5, 000. 00 Disbursements- 59.75
Total_ 5,059.75
(Eliminating disbursements and dividing the fee 50/ 50, Petitioner claims only $2,500 of this bill)
*773 103. Intervenor, by letter of March. 30, 1964, notified the Postmaster General that it had sustained a loss of $128,763.26, and that it was legally and equitably entitled to any funds payable by the Government in connection with said contract. A copy of said letter is annexed to the Intervening Petition marked “Exhibit F” and was offered at the trial as Exhibit I.
104. The termination of the plaintiff’s contract for default on the basis of the entire record in this case was not justified because the plaintiff was not in fact in default in the performance of the work. It is true that the original time for performance was not met by the plaintiff. It is also true that the defendant hindered the performance of the plaintiff’s work from the very beginning by denying the necessary access to the work so that the plaintiff could begin its tear-out work efficiently by the use of machines whereas it was necessary to utilize hand work for much of the tearing down of train-sheds. The defendant through its architect further hindered the work by furnishing the plaintiff defective plans which caused dimensions of many piles already driven along an 800-foot line of work to be out of place. This in turn required the redesign of pile caps for an 800-foot row of piles that had already been driven. Goldberg-LeMessurier, a subcontractor of Pedersen and Tilney were responsible for the defective plans (see Tr. 1170) and yet the defendant through Fleischbein and also the architect blamed the plaintiff for piles and beams already installed being in the wrong place and then complained of defective concrete installation in beam Nos. 2, 3, 4 and improper location of beam No. 7. Adding to all of the above the underground obstructions which the plaintiff and its pile-driving subcontractor encountered which constituted extra work for which very substantial amounts of additional time were required for work performance, it is conclusively demonstrated that the plaintiff was entitled to a great deal more time for performance of the contract work than the original time for contract completion.
105. After the termination of the plaintiff’s contract, the plaintiff appealed the contracting officer’s decision to the Postmaster General. The appeal was presented to the Post *774 Office Board of Contract Appeals, which after extended hearings found that “the default termination was premature” and remanded the matter to the contracting officer for settlement of the damages to the plaintiff. This decision was entered March 14,1963. Thereafter when the parties were unable to settle on the amount of damages, further hearings were held and a subsequent decision entered on June 29, 1964, by the Post Office Department Board of Contract Appeals in which the Board found that in the absence of a suspension of work clause it was without jurisdiction to consider the plaintiff’s damage claim.
106. At a pretrial conference on May 26, 1970, the parties agreed to a trial de novo before this court.
107. The contract contained no termination for convenience provision.

Damages

Extra WorJc Resulting From Changed Conditions

108. Removal of sixty-seven concrete footings.
(a) During the work of demolishing the 3 concrete railroad station platforms, each 14' x 1,100', the contractor uncovered 67 concrete blocks, each 6y2 cu. yds. and weighing approximately 2 tons each. These served as footings to the steel columns supporting the station canopies.
(b) The 67 concrete footings were not visible or known obstructions below the surface of the ground, and could not be determined by inspection at the site nor indicated by the plans and specifications.
(c) When the contractor observed the condition, he promptly notified the architect, who called the contracting officer in Washington. The architect ordered the contractor to proceed with the work of removing the footings and, on September 7, 1961, the contractor sent a notice, in writing, describing the change and the estimate of the cost for doing the job. The architect approved the proposal for doing the work and sent it to the contracting officer for the issuance of a bulletin.
(d) This work, not contemplated under the contract, was *775 performed by the contractor during the period September 5th through 9th, inclusive, employing men and equipment to break up, excavate and dump the blocks outside the job site, and fill the voids with gravel fill brought in by the contractor.
(e) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom and trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(f) The direct costs for labor, equipment and materials to do this work, is the sum of $6,725.35, to which is added $1,592.09 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $8,317.44. This is fair and reasonable for this work.
109. Removal of steel reinforced concrete and granite box.
(a) During the excavation and the driving of piles for the location of beam No. 8, the contractor uncovered what appeared to be an abandoned, sealed off entrance to a tunnel, measuring 20' x 8' x 6', which obstructed the work. This underground structure was not visible or known and could not be determined by inspection at the site nor indicated by the plans and specifications.
(b) The contractor promptly notified the architect of the condition. After the condition was examined and measured, the architect directed the contractor to remove the granite and haul it away, on a time and material basis, in order to permit the preparation of the area for a redesign of beam No. 8. The architect agreed to notify the contracting officer for the issuance of a bulletin for a change order.
(c) This work, not contemplated under the contract, was performed by the contractor in 8 days during the period October 31st to November 9,1961, by the employment of labor and equipment and the disposal of the granite by dumping it off the project site.
(d) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom and trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and *776 listing in the compilation sheets prepared by the contractor from these records.
(e) The direct costs for labor, equipment and materials to do this work is in the sum of $1,644.80, to which is added $636.96 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $2,281.76. This charge is fair and reasonable for this work.
110. Change in Forms and Removal of Granite Foundation.
(a) By the architect’s issuance of change order No. 1 revised, on October 30, 1961, the new dimension changed the center line of beam No. 2. To conform with the change order, the contractor, on a time and material basis, removed and replaced the wooden forms and steel previously installed and ready for concrete, and then removed a granite foundation to clear the obstruction to the Work.
(b) This work, not contemplated under the contract, was performed by the contractor during the period October 31st through November 8, 1961, by the employment of labor, equipment and materials.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom and trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs for labor, equipment and materials to do this work, is the sum of $256.80, to which is added $112.10 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $368.90. This charge is fair and reasonable for this work.
111. Removal of Concrete on Top of Steel Tv/nnel Decks.
(a) During the excavation of the area over the roof of the existing tunnel, the contractor uncovered concrete filling between the steel ribbing of the tunnel roof. This condition was not known or discernible by inspection at the site nor indicated by the plans and specifications. On the architect’s order, *777 on a time and material basis, the contractor removed the concrete by the use of band labor, jack hammers, burners, compressor and a truck and removal from the project site.
(b) This work, not contemplated under the contract, was performed by the contractor during the period October 16th through October 26,1961.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs for labor, equipment and materials to do this work is the sum of $1,352.00, to which is added $559.95 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $1,911.95. This charge is fair and reasonable for this work.
112. Removal of Obstructions at Piles Nos. 84, 85, 86.
(a) During the pile driving operations by the subcontractor, Raymond, obstructions could not be penetrated or broken at pile locations Nos. 84, 85, and 86. When this was brought to his attention, the architect (Smith), ordered the contractor, on a time and material basis, to excavate and remove the designated obstructions.
(b) This work, not contemplated under the contract, was performed by the contractor during the period October 26th through November 10,1961.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $722.40, to which is added $316.25 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $1,038.65. This charge is fair and reasonable for this work.
*778 113. Removal of Obstructions — February 5th to March 17, 1962.
(a) On November 17, 1961, the contractor was ordered by tie contracting officer and tbe architect to stop all work on the project. At the January 24, 1962, conference, the architect and the contracting officer ordered the contractor to resume, on a time and material basis, only the work of removing obstructions designated by the resident engineer.
(b) This work, not contemplated under the contract, was performed by the contractor, commencing on February 5th and continuing uninterruptedly until March 17,1962.
(c) During the course of the work, the architect’s resident engineer kept and certified a daily record of the contractor’s labor and equipment applied to the work. The contractor adopted the resident engineer’s records and assigned a charge for the labor and equipment engaged in this work, as are listed on the compilation.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $14,436.30, to which is added $5,367.09 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $19,803.39. This charge is fair and reasonable for this work.
114. Work on the West Property Line Ramp.
(a) During the work of laying out the West Property line separating the project site and the property of the New Haven Kailroad, the line fell approximately in the middle of the concrete ramp (also here described as a railroad station concrete platform). The contractor cut the slab (or ramp), removing the portion on the project site and leaving that on the property of the New Haven Kailroad, showing an 8" thick slab above the ground, for the length of the ramp (platform), a distance of 1,100'.
(b) On the directions of the architect (Smith), the contractor, on a time and material basis, installed a concrete curbing or retaining wall, 10" wide and 2' deep along the whole 1,100' length of the ramp (platform).
(c) This work was not contemplated under the contract and was not provided for under the plans and specifications.
(d) The contractor employed its labor, equipment and ma *779 terials and performed this work during the period August 28th through October 3,1961.
(e) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(f) The direct costs of labor, equipment and materials to do this work is the sum of $6,777.60, to which is added $1,954.65 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $8,732.25. This charge is fair and reasonable for this work.
115. Demolition of Concrete and Granite at Pneumatic Tube.
(a) After the removal of one of the station platform slabs, an undisclosed, unused structure was uncovered, obstructing the construction of pile cap at pile No. 5. The architect (Smith), ordered the contractor, on a time and material basis, to remove the concrete and granite to 2'3" below the ground, in order to permit a redesign of beam No. 5 at the location.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, during the period October 4th through October 11, 1961.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct cost of labor, equipment and materials to do this work is the sum of $1,070.50, to which is added $431.33 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $1,501.83. This charge is fair and reasonable for this work.
116. Demolition of Foundation at Column No. 1.
(a) During the excavation for placing beam No. i, at the Column No. 1 location, the contractor encountered an undis *780 closed and unknown granite wall, obstructing the placement of the beam. The architect (Smith), ordered the contractor, on a time and material basis, to remove so much of the granite wall as would permit the installation of beam No. 1 at the designated place and grade.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, during the period September 23rd through September 26,1961.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $389.20, to which is added $155.17 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $544.37. This charge is fair and reasonable for this work.
117. Demolition of Fovmdation at Oolv/m/ns Nos. 5 and 6.
(a) During the excavation for placing beam No. 6, at column Nos. 5 and 6 locations, the contractor encountered an undisclosed and unknown granite foundation, obstructing the placement of the beam. The architect (Smith), ordered the contractor, on a time and material basis, to remove so much of the foundation as would permit the placement of the beam in the specified place and grade.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, during the period October 10,11, and 13,1961.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing the compilations in sheets prepared by the contractor from these records.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $443.20, to which is added $166.61 *781 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $609.81. This charge is fair and reasonable for this work.
118. Demolition of Granite at Beam No. %.
(a) During the excavation for the placing of piles for beam No. 2, the contractor encountered an unknown and undisclosed granite, obstructing the placement of the beam. The architect and the contracting officer ordered the contractor to remove the granite, on a time and material basis, to permit the placement of the beam in the specified place and elevation.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, on October 30 and 31,1961.
(c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $340.60, to which is added $163.10 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $503.70. This charge is fair and reasonable for this work.
119. Demolition of Granite Bloch at Location of Column No. 3.
(a) During the excavation for the placing of the beam at column No. 3, the contractor encountered an undisclosed granite, obstructing the placement of the beam. The architect and the contracting officer’s representative ordered the contractor to remove the granite, on a time and material basis, to permit the placement of the beam in the specified place and elevation.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, on September 13,1961.
(c) The contractor recorded the labor, equipment and ma *782 terial employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $201.60, to which is added $76.69 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $278.29. This charge is fair and reasonable for this work.
120. Removal of debris of adjoining contractor.
(a) The Post Office Department held a contract with the Bay State Wrecking Company, for the demolition of certain structures in the southerly end of the subject project site and extending onto the adjoining area. When the contractor (petitioner) , was authorized by the architect to proceed with its work, it encountered material debris covering a large part of the southerly end of the project site.
(b) The debris and the unfinished work of the adjoining contractor, railroad tracks and building walls, prevented this contractor from entering with equipment and personnel contemplated for use at the project site. The contractor notified the contracting officer and the architect of the condition and, when the adjoining contractor failed to remove the debris, the architect directed the contractor to do so on a time and material basis.
(c) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, on August 9, 29, September 1, 8 and 11,1961.
(d) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(e) The direct costs of labor, equipment and materials to do this work is the sum of $1,988.40, to which is added $558.33 for insurance, small tools, overhead, 10 percent profit and *783 cost of bond, for a total of $2,546.73. This charge is fair and reasonable for this work.
121. Glean Out Sump and Pwrnp Boom.
(a) On the order of the architect, the contractor sent his workmen and equipment into a pump room located on the construction site to clear it of water and muck. This work was necessary to permit measurements by the architect for the purpose of redesign of the sump and pump room and was done on a time and material basis.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor and equipment, during the early part of the job. This was a small item of work for which a charge of $20.00 was made by the contractor and is considered fair and reasonable.
122. Although the plaintiff has a claim relating to a change ordered on March 13,1962, two days before the letter defaulting the plaintiff was sent, the records in evidence do not substantiate this claim and it is therefore disregarded for lack of proof.
123. The contractor also makes a claim for some $16,000 covering the removal of unsuitable material which it says it was ordered to remove by the architect. By reason of failure of proof, this claim is disregarded. In explanation of this action, the contractor says he purchased 1,900 cubic yards of fill material at $3.50 per yard for a total direct cost of $6,650. We are directed to no invoice covering this purchased material.
124. Drilling and Filling 88 Holes, Replacing Obstructions. •
(a) When the subcontractor (Eaymond), predrilled specified 38 pile locations and encountered obstructions which could not be penetrated, the holes, ranging from 10' to 30' deep and 12" to 14" wide, were abandoned for other locations. On the order of the architect, and on a time and material basis, the contractor hand filled these holes with borrow gravel on October 27 and 28,1961.
(b) This work, not contemplated under the contract, was performed by the contractor, employing labor, equipment and material on October 27 and 28,1961.
*784 (c) The contractor recorded the labor, equipment and material employed and used in this work, and kept the record in the usual custom in the trade, by payrolls, daily job diary, daily time sheets, equipment lists and invoices for materials, and listing in the compilation sheets prepared by the contractor from these records.
(d) The direct costs of labor, equipment and materials to do this work is the sum of $408.15 to which is added $152.59 for insurance, small tools, overhead, 10 percent profit and cost of bond, for a total of $560.74. This charge is fair and reasonable for this work.

Claim for Equitable Adjustment for Additional Costs Occasioned by Belays

125. July 31 to August 31,1961.
(a) When the contractor entered upon the site to commence its work in accordance with the architect’s approval of the contractor’s method of procedure, it was prevented from employing its equipment due to the work of Bay State Wrecking Co., the adjoining contractor, to the south, blocking equipment access to this project site. The failure of the adjoining contractor to remove railroad station platforms and canopies, tracks, masonry walls, a building bridge and the debris formed by its work, obstructed the contractor from employing the equipment brought on to the site and contemplated and approved for use in the demolition work.
(b) The contractor notified the architect of the project condition, and, after several discussions and a meeting with the contracting officer’s representative, the contractor was ordered to proceed with hand labor and tools and to make its claim by keeping its record of the time during which the work was delayed and equipment unemployed. The contractor undertook the work in this maimer from July 31st to August 31, 1961, and notified the architect, iby progress reports, photographs and letters of claim during the course of the work.
(c) The contractor was interfered with in its use of equipment available at the project site due to the delay caused by the work of an adjoining contractor. The delay resulted in *785 the loss of the contractor’s equipment on the job site during this period for which it is entitled to the fair market rental value of the standby equipment idled.
(d) The contractor recorded the equipment which was immobilized and not used in the project as the result of this delay, in records kept in the usual course of the business and custom in the trade, by daily equipment sheets, daily job diary and listing in the compilation sheets prepared by the contractor from these records. These charges are based upon the fair rental charges for similar equipment used in the area.
(e) The direct costs of standby equipment is the sum of $7,176.00 to which is added $1,593.97 for insurance, overhead, 10 percent profit and cost of bond, for a total of $8,769.79. This charge is fair and reasonable.
126. Although the contractor claims entitlement to delay cost for the period November 13-December 4, 1961; from December 4, 1961-February 4, 1962; and from February 6-March 19, 1962, the proof relating to such entitlement is not satisfactory.
127. The plaintiff has been paid for work which it performed to the entire satisfaction of the architect and the Post Office Department, the sum of $122,130. The payment was made shortly after the submission by the plaintiff and approval by the architect of pay estimate No. 3 which showed that at that time on the $265,000 contract, the plaintiff had performed work for which it was due $135,700 but that (including prior retainage of 10 percent) $13,570 was to be retained thus the figure of $122,130. Thereafter, the plaintiff performed additional work in the amount of $16,300, for which no payment was received. Adding the $135,700 and $16,300, it appears that plaintiff performed work of a value totaling $152,000. This included a total of $52,000 covering foundation work performed by Eaymond Concrete Pile Co., plaintiff’s subcontractor for which Eaymond was never paid by the plaintiff. The above figures then show that plaintiff was paid $122,130 for work, $100,000 of which was performed by its own forces and $22,130 for work performed by Eay-mond.
*786 128. Since it has been found that the plaintiff was wrongfully terminated for default, it is entitled to its anticipated profits on work remaining to be accomplished.
129. Tredennick-Billings Corp., the contractor which Aetna brought in to complete the work was paid a total of $280,427.06. Of this amount $28,042.70 represented its profit.[1]
130. The best evidence relating to the amount of anticipated profits to which the plaintiff is entitled is the amount which was paid to Tredennick-Billings Corp., or $28,042.70.

Summary of Damages

131. On the basis of the entire record there is due to the plaintiff the following amounts:
1. Anticipated profits_$28, 042. 70
2. Removal of 67 concrete footings — finding 108- 8,317.44
3. Removal of steel-reinforced concrete and granite box— finding 109_ 2,281.76
4. Change in forms, etc. — finding 110_ 368.90
6.Removal concrete top of tunnel — finding 111- 1,911.96
6. Removal obstruction at piles 84, 85 and 86 — finding 112_ 1,038.65
7. Removal of obstructions 2/5/62-3/17/62 — finding 113_ 19,803.39
8. Work on west property line ramp — finding 114_ 8,732.25
9. Demolition of concrete and granite at pneumatic tube— finding 115_ 1,501.83
10. Demolition of foundation, column 1 — finding 116_ 544.37
11. Demolition of foundation, columns 5 and 6 — finding 117 - 609.81
12. Demolition of granite at beam 2 — finding 118_ 503. 70
13. Demolition of granite block at column 3 — finding 119 278.29
14. Removal of debris of adjoining contractor — finding 120 - 2, 546.73
15. Clean out sump and pump room — finding 121_ 20. 00
16. Drilling and filling 38 holes — finding 124_ 560.74
17. Increased costs by reason of delays to the work 7/31-8/31/61- 8, 769. 79
Total- 85, 732.30
Deduct amount paid to plaintiff for work done by Raymond for which Raymond was not paid by plaintiff_ 22,130.00
Net Due Plaintiff_ 63, 602. 30

*787
Summary of Aetna’s Damages

132.
(a) The surety company which was called in to complete the work of the improperly terminated contract reasonably paid for work performed in excess of amounts received from the defendant the sum of (finding 98)_$68,263.26
(b) The surety was called upon to pay to Baymond International, Inc., as a result of a Miller Act suit the sum of (finding 99)_ 60,500.00
Total_$128,763.26
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover the sum of sixty-three thousand six hundred two dollars and thirty cents ($63,602.30), the intervenor, The Aetna Casualty and Surety Company, is entitled to recover the sum of one hundred twenty-eight thousand seven hundred and sixty three dollars and twenty-six cents ($128,763.26) (subject to the execution of the release referred to in the opinion), and the defendant’s counterclaim and contingent counterclaim are dismissed.

 The contract aid not contain a convenience-termination article.

 These are characterized as work performed under the contract division of work after October 15, 1961, but not Included in pay estimate No. 3; testing engineering services; extra work in removing unsuitable material below design guide; change in pile cap elevations along line A; delays from November 13, 1961 to March 19, 1962.

 Plaintiff claims, in short, that Dorchester was indebted to Raymond in a total of $122,046.7$ ($60,500+$61,546.78), of which only $60,500 has been paid.

 In view of our disposition of this Issue, It Is unnecessary to grant defendant’s motion to strike. That request becomes moot.

 Before the trial judge, plaintiff seems to have recognized the weakness of his proof. In “Plaintiff’s Rebuttal to the Defendant’s Comments and Objections to the Plaintiff’s Proposed Findings of Fact”, p. 23, counsel emphasized other evidence (aside from the judgment) to show the sums owing to Dorchester for work done by Raymond, saying that if “Defendant’s counsel persists in his objection to the admissability of the Certificate of Judgment, the Plaintiff will not press the issue and relies upon the evidence above stated.” Since no certificate of judgment was ever offered as to the $61,546.78, this comment may possibly have referred only to the $60,'500 judgment by Raymond against the surety, but we take it, in context, as referring to both judgments. (The trial judge did, however, accept the smaller judgment as properly proved, as do we, see Part II, D, infra.)

 So far as we are aware, plaintiff has not moved to set aside this judgment, nor has he given us any valid excuse for failing to contest Raymond’s motion for summary judgment.

 under plaintiff’s calculation, this would leave him with $191,373.30; this figure includes, of course, the various additional claims which we have held supra not to have been proved.

 The conclusion of plaintiff’s “Exceptions and Brief”, filed after the trial judge’s decision, expressly asked that judgment be awarded plaintiff for $314,393.07 and that the surety be granted $140,805.30.

 At the oral argument, the surety’s counsel pointed to Dorchester’s “Application for Contract Bond and Agreement of Indemnity” (fdg. 92) which contains what appears to be a broad Indemnity provision, but this provision was not relied upon In the brief and we are quite uncertain whether It covers, or was Intended to cover, the excess costs for which the surety now seeks recovery (i.ea case In which the contractor was wrongfully defaulted by the Government and the surety undertook to complete).

 At the oral argument, but not previously, plaintiff’s counsel joined In tbis position, see Part I, B, 4, supra, drawing the further conclusion (which the defendant does not draw) that the contractor is entitled to these additional sums.

 There was also an explicit provision that the agreement was without prejudice to the Government’s claims against Dorchester or the latter’s against the Government “arising out of the contract.”

 To decide this case, we need go no further than to hold that this Is so where the Government admits that the default termination was improper or, as here, where a competent tribunal so holds in a proceeding in which the contractor (not the surety alone) mates that contention. We leave open the Issue of whether the completing surety can challenge the default termination where the contractor falls to do so.
In Anderson v. United States, 97 Ct. Cl. 545 (1942), an early case which is comparable on the facts, there was no reliance upon a take-over agreement (if one existed), the surety Invoking solely its alleged rights of subrogation. The court’s opinion goes off on that ground alone. Dale Construction Co., supra, shows that there is no invariable rule against recovery of the surety’s completion costs.

 This Is not a ease of disentangling expenses unattrlbutable to the Government from those for which It was responsible (see Boyajian v. United States, 191 Ct. Cl. 233, 244-45, 252, 423 F. 2d 1231, 1238, 1242 (1970)). Here, defendant Is liable for all completion costs, provided they were reasonably Incurred. There Is no problem of separating government-caused expenses from others. In the latter circumstances there Is a greater need for proof by the claimant that It Is not charging the defendant for expenses for which It should not pay.

 Dorchester has received $122,130; Aetna has received $212,163.80. The total already paid is therefore $334,293.80.

 Our findings, unchallenged in this respect by defendant, cover about $58,000 worth of changes and extras (over and above the original contract price) in the portion of the work performed before the improper termination. There is also the plaintiff’s anticipated profit of some $28,000. Combining these figures with the initial contract price of $265,000 comes to over $351,000 — less than defendant has already paid out. (If we subtract the $17,000 of so-called duplication (see Part III, infra), the total amount roughly equals the sum already paid out.) And this sum does not include the unspecified sum for changes and extras in the part of the work completed after the termination by Aetna’s subcontractor, Tredennick-Billings, which would, of course, add to the contract price.

 In any event, even if part of the $60,500 judgment somehow represented a double payment for work done by Raymond, the surety would be entitled to recover an equivalent sum, so as to be made whole for the excess expenses of completion. See Part III, infra. Aetna should end up reimbursed for (a) the full $280,427.06 it spent completing the work, and (b) the Miller Act judgment it had to pay to Raymond.

 The judge also denied defendant’s eounterclaim against plaintiff, but tbe Government does not except to that denial.

 Defendant has satisfied us that, out of the $63,602.30 we award the plaintiff on 17 items, the sum of $16,961.97, relating to six of those items, has already been paid the surety. We are not, however, so convinced as to the rest of the counterclaim demand of $46,8311.97; aside from this $16,961.97, Dor-chester seems to have received payment for all original contract work (not changes or extras) it did itself (excluding Raymond’s work for which the contractor never paid but which Aetna paid via the satisfaction of Raymond’s District Court judgment for $60,500) and the surety was not paid therefor.

 The contractor in Dale might be liable, under a private indemnity agreement, to pay over to the surety the sums to -which the latter was entitled, but this court could not enforce or implement that agreement; so far as the court was concerned in that case, the contractor would receive the entire award. What happened thereafter was not this court’s affair.

 This Is 10 percent of the amount paid to it by Aetna. There was actually paid to this firm $18,381.40 plus 10 percent profit on extras totaling over $100,000.